Are you ready to proceed? Yes, Your Honor. You have 30 minutes. If you want to save some time for rebuttal, just keep an eye on the clock because we won't remind you about it, okay? Thank you, Your Honor. Good morning. May it please the Court, I'm Daniel Maynard and I represent the petitioner, Robert Jones, who's here asking for a writ of habeas corpus. There's a number of issues that the Court is going to have to address this morning and I will attempt to reserve five minutes for my rebuttal. The fundamental issue that the Court is going to have to address is whether Robert Jones received a fair trial in light of the conduct of the prosecutors and the police officers in this case. What happens in Mr. Jones' case is that the prosecutor allows the police to commit perjury. He knows that it's going to happen. I believe he's a willing participant in it and it had a material effect on this case. We can see that because the prosecutor sets the stage for the perjury in the opening argument. Opening statement, Your Honor. Opening statement. In his closing argument. Counsel, what do we do with the factual finding by Judge Leonardo, who presided over both the criminal trial and the PCR proceedings, where he found that there was not bad faith on the part of the prosecutor and that the dispute, for example, over the two doors was the result essentially of, I guess you'd call it innocent misrecollection as opposed to intentional perjury? Don't we have to give epidefference to that finding of fact? Your Honor, I'm well aware that you've aptly said in the past, the elephant in the room is what's the deference that's to be applied, what's the standard that's to be applied, and whether this Court is just sitting here and putting their judgment in lieu of the judgment that was given by the trial court. In this case, it is not. Well, your argument, I think, has to be that the evidence is clear in convincing that the trial court erred in its factual finding, right? Absolutely is. Okay. Can you help me then with, because I read the testimony of all of the witnesses that you're complaining about, and I looked at the exhibits that were introduced to the jury, and I'm particularly interested in, I think excerpts of record 658 is the crime scene diagram that shows the two doors in question. That's correct. And I looked at the record and I found that there were two doors, one side by side, and then I have, they're not very good, they're black and white photocopies of the doors themselves, and there was testimony, was there not, that there was damage to both doors that you could, it appears to me, I'm looking at what I think is 57. I'm not sure about the exhibit number, because unfortunately the copy that was provided is not very clear. But it appears to have a kick mark on the bottom of the door. That's not something that came up before the court. Your Honor, when you look at it in the context of what happens, we have a double homicide that occurs at the Moon Smoke Shop. The police come in and they do an extensive investigation. They mark all of the evidence. They mark exhibit 58, which is the door that's been kicked in. Right. 58 is the office door. That's the office door. Right. And there's, it's pretty clear that that door was kicked by the responding officers who were trying to make sure that there was neither a victim nor another robbery suspect hiding inside. That's right. Okay. But there was also testimony, was there not, that one of the victims ran to the back of the store and there was shouting heard by the surviving witnesses, and I'm sorry to have to say this on the record, you know, get the fuck out of there, and why wouldn't that be consistent with forcing a victim hiding in a locked bathroom door to come out? Well, there was testimony. I agree. That's exactly what was said, but nobody, whether the police, nobody said they heard a door get kicked. No one said they heard anything get slammed, kicked, broken into. There's no evidence of that whatsoever. What you have is a person who's near that back room and he's found dead. He's shot. Now, nobody knows. But it's possible that he was inside the bathroom door, the robber ordered him out, and as soon as he stepped out in front of the bathroom door, he shot and killed him. That's possible. Because we got a body there. There's no question about that. We don't disagree. Okay. So now I'm back to my conundrum. If that's the state of the record, and now I've got a finding by Judge Leonardo in the PCR proceedings, which appears to be a plausible view of the evidence in the record, how can I declare it objectively unreasonable because clear and convincing evidence compels the opposite conclusion? Judge Tolman, I'm going to tell you. Okay. I'm all ears. I'm all ears. All right. You're going to look at the Nordstrom case that was tried eight months earlier. Scott Nordstrom is the co-defendant with Jones. The cases are severed. Detective Godoy gets on the stand. Godoy. Godoy. Godoy testifies that the police kicked in the door. All right. And that's 58. No question. Prosecutor brings that out. Absolutely happens. Now let's look at what happens in Jones's case, which is eight months later. Now, keeping in mind that in Jones's, in Scott Nordstrom's case, there was an eyewitness who had actually put him there. So the evidence is slimmer against Jones than it is against Scott Nordstrom. David Nordstrom. Well, because David was sitting in the truck, right? That's his story. But he is the witness in both cases. But in Scott Nordstrom's case, there is an eyewitness woman who's outside who identifies him as he's running from the store. Okay. She also says he has a cowboy hat on too. But Mr. Jones also had a habit of wearing a black cowboy hat. That's the contention. However, the evidence would be from the eyewitness that the cowboy hat was being worn by Scott. But isn't that an issue that the jury had to resolve? I mean, they had a sketch. I would agree. And I think we have to, if you and the evidence lie most favorable to support the verdict, we have to conclude that the jury must have believed that the sketch that was introduced into evidence was your client. I think that you can do that. Okay. Also, Judge Gould, if I could interject a question to you, please. Uh, what's your argument as to why it's plausible that, uh, that this testimony about the door being kicked in isn't, uh, is not an error, that it's an intentional collusive fraud of the prosecutor and the detectives? All right. Because, because, look, uh, let me put it this way. They, your argument depends on reaching the conclusion that the prosecutor is subjecting, uh, himself to potential disgrace for and disbarment for dishonesty and that the officers are risking going to jail for perjury. And, and for what purpose? To bolster the testimony of a witness, Ms. Irwin, who seems somewhat flaky in any event because of the story about the dream and, you know, and her background. And that in the context of all the other evidence, I'm having a hard time seeing that as a, as a likely scenario of what really happened. So give me your best argument that why we should believe that's collusive. Yes, Judge Gould. What happens in, in Jones's case is White puts Godoy back on the stand. Okay. Godoy testifies that when he arrives on the scene, he finds a door that's been kicked open in the back of the smoke shop. He doesn't say that the police have done it. He doesn't say who's done it, but he says it's been kicked open. Next day, they put Lana Irwin on the stand. Irwin testifies that she's overheard Jones talking to someone else that he, they had kicked open a door to get to a witness in the back. Okay. Okay. The next day they put detective Woolridge on the stand. Detective Woolridge had been the state's representative in the Nordstrom case. She had heard Godoy say in that case that the government or the police officers had kicked in the door. And there were two reports that showed that police officers kicked in the door. She then testifies that Irwin told her about the kicked in door in pre-trial interviews prior to this case. Now, if she did, we don't know how Irwin would have known that because the door wasn't kicked in. But Irwin is just giving a statement of what she thinks she overheard the defendant say, right? So what if he told a buddy he's talking to, I kicked on the door or Scott kicked on the door and she thinks he says kicked in. I mean, we're not really talking about her testifying about what happened as a precipient witness because she wasn't there. She's relating what she thinks he said. If I understand that, what she thinks the defendant said. Yes, Your Honor. But the next statement is the lie. The absolute categorically nothing but a lie. Woolridge says next that there was no testimony at the Nordstrom trial about the door being kicked in. White solicits and elicits that testimony from her. She knows it's a lie because her partner, Godoy, has testified that the door was kicked in by the police. She's the representative that sat there. She didn't. This is an inadvertence. This is David White. After having said this in the opening statement, he then has her commit this perjury. There's, Judge, a lie is a lie is a lie. Now, I don't disagree with you there, but I've seen an awful lot of witnesses at facts, you know, trial testimony versus deposition testimony. And, you know, that can happen in a way that's not necessarily like a collusive fraud. But in this particular situation, when you look at the sequence of the witnesses, when you look at the testimony, this is one of the biggest murder cases. There are six homicides that are being tried. And, Your Honor, I put into the records some of the comments from our own State Supreme Court about the corruption that was going on in the prosecutor's office in Tucson at this time. Mr. White's counsel, I know all that. But, I mean, aren't we confined to the facts in the record? I mean, that sort of painting with that brush doesn't help us to determine whether or not a factual finding based on the testimony that we're talking about is objectively unreasonable and irrational. But you're going to ask me whether or not, why would somebody put their license at risk? Because, and your answer, because the entire office was corrupted. No. The whole system was corrupted, in your view. No. But there were officers. Godoy got investigated and prosecuted for corruption.  And it was in conjunction with Godoy doing the same kind of conduct, where Mr. Peasley, the prosecutor down there, lost his license and was disbarred. And it was in conjunction with Godoy doing the same kind of conduct. Well, Mr. Maynard, I'm puzzled by one fact. Let's suppose that there was a cabal plotting to present perjure testimony. Since the evidence seems to be that Jones stayed at the counter, whereas Scott Nordstrom went toward the back, I'm talking about the circumstantial evidence of where the shell casings were found and what type of shell casings there were, 9mm versus 380s. Why would the evidence of kicking in a door, which was something that Scott Nordstrom would do or not do, be so important as to formulate the goal of this cabal to present perjure testimony? I mean, much more important would be to say, we have a witness that saw Jones shoot people dead. They didn't say that. They just said, what role? Why is the door kicking in material? To give credibility to Lana Irwin's testimony. As Judge Gould indicated, it was some of the most incredible testimony because of the dream-like sequence. Your Honor, it is not. But her explanation for that was fear of your client and retaliation, that she didn't want to simply go to the police and say, look, I overheard Robert Jones say the following things to Steve Coates, because she was afraid he would come after her and her child. I understand that was her explanation, Judge, as to why she did it. But it's a simple explanation if you're dealing with a guy that's accused of six murders. But clearly, what we have here, we have government officials in the form of Detective Bulridge, who gets on the stand within months after she has sat through a trial of a case. And she says that the police kicked in the door, and she knew that. She had been there. She was one of the chief detectives. She had seen the reports. She specifically says there was no testimony at Nordstrom trial about the back door being kicked in. That's just false, Judge. But even you say false, the PCR court said she was wrong, and I'm not going to find it was done intentionally. And then he points to about a half a dozen other pieces of evidence which were fully corroborated by the physical evidence or other witnesses, which was also provided by Irwin. And the PCR court looked at that and said, in light of all of the evidence against Mr. Jones, and because of my finding that she's not doing this intentionally, I don't think that Jones was prejudiced by this, because the jury would have still believed Irwin on all the other information that she provided that was corroborated. But it was her credibility. And the prosecutor knew this. The police knew this. This is the reason that they set it up this way. It's like NAMPU or Jiglio. The issue became, in those cases, the credibility of the witnesses. I mean, when one looks at NAMPU and he's asked, were you paid anything for your testimony? And he says, no. It's not a substantive part of the crime that he's testifying about. It's his credibility. And Justice Warren told us in that case, gave us clear direction, that when it comes to the credibility, if there is false testimony under the Fourth Amendment, the conviction can't stand, or Fourteenth Amendment, rather, the conviction can't stand. But we really are back to the AEDPA standard, because we've got a factual finding to the contrary that we have to overturn before we can reach your conclusion that the testimony was knowingly false. And, Your Honor, that's what we all struggle with, and that's what you've struggled with in a couple of dissents that I've read. Not just in dissents. We struggle with it in every AEDPA case, where there's a factual dispute that the jury or the State court judges resolved adversely to the habeas petitioner's argument. It happens rarely, but it does happen. For example, we have rules in trial courts that both civil and criminal cases and it happens more often in civil cases, but where somebody will move for a directed verdict, and the case, judge says, I'm going to reserve ruling, and the case goes to the jury. The judge may many times hope, well, I hope they're going to rule the right way. But if they don't rule the way that the judge thought, because it was inconsistent with either the law or the facts, as he saw them, he or she saw them, the judge can grant the directed verdict at the close of the case. And the judge is finding that the opinion of those 12 people was unreasonable. That's what I'm asking you to do in the case of Judge Leonardo. But what do we do about the fire, the union fire hall murders? There isn't any allegation there that you're making that Irwin's testimony was false, is there? Yes, there is. It deals with the positioning of the body of Mr. Bell. Okay. But we've looked at the photographs and the PCR court found that the way that the witnesses described the position of the bodies, including the responding officers, that it wasn't inconsistent with what Irwin said. And we have the photos. We've looked at them. And it looks to me like the victims are basically slouching in their chair. Now, whether you would say they're slouched over the bar or over the chair, I'm not sure it makes a great deal of difference. Well, I think it makes a lot of difference, Judge, because what you need to look at is the testimony of the first person who's on the scene. What happens is Mr. Alicia comes in and he finds four dead bodies, including his girlfriend, who apparently is still alive at the time. And he moves her. And he testified, when he gives statements, he says that Mr. Bell's body is in the chair, slumped over the, on the bar. And, you know, sometimes we get into small words and what they mean, is, is, is, or on, is on, but he says on the bar. And there are other, but the photographs are clearly taken sometime after he has called 9-1-1. So is it your argument that the position of the victim's body was moved? I think it was inadvertently moved. There, there are two other. But no, but there's nobody who testified that they moved any bodies. That's right. Right. But Mr. Alicia says it's on the bar. It's clearly not on the bar when the photographs are taken. But he's seated at the bar and he's kind of slumped at an angle in the chair. I mean, it's really hard for me to look at that picture and say that that's totally inconsistent. With the way the witnesses would describe, you know, you and I both know that innocent misrecollection of fact is not uncommon. And when you have multiple witnesses viewing particularly horrendous crime scenes, I mean, this has got to be a pretty gruesome scene for laypeople, even for responding officers. It's gruesome for everyone. The pictures are as bad as I've ever seen. Yeah. But he says he's on, he's on the bar. The two other officers say he's on the bar. At some point, when you look at the pictures, nobody would look at that picture the way that Mr. Bell is situated and say he's on the bar. He is slumped back. He is head is leaning back. But what is it, counsel, if I could ask, what is it precisely that you think Ms. Irwin said that was false about the guy at the bar? Ms. Irwin testifies that she heard Jones say that one of the victims was shot in a red chair and that his head was leaning back. Now, using common sense, I can't imagine why a person who's committed a murder would say to somebody, oh, I shot this guy. And by the way, the chair was red and his head is leaning back. What actually happened was that it appears from the physical evidence that Mr. Bell's head was placed down on the bar and he was shot through the back of the head. And there's bullet wounds that go into the bar and the blood is around the bar. At some point, the photo looks sort of like his head is back at that time, right? The photo is consistent with what she said. And I suggest to you that the police gave her the photo to look at, just as they gave her photos to look at in the moon, and that her testimony is based upon having been coached by the police by showing the photos. There is no other way that she would have come up with those two explanations because they're not consistent with what the facts are. And it's consistent with the prosecutor and the police doing whatever they felt was necessary to try to get a conviction in this case. I thought she contacted the police. I mean, she's sitting in a jail cell in Phoenix, right? Yes. When they first speak to her? Yes. She did not. I believe that they had learned of her through one of the other potential witnesses that Jones may have been in Phoenix at one time, and they came up to Phoenix to find who it was that he had been living with or knew. Okay. So your argument to us now is that they must have shown her crime scene photographs the first time they interviewed her in the jail cell in Phoenix? Not necessarily the first time, but at some point they did. Judge, there's no other explanation. But I mean, I assume we had testimony, did we not, from the interviewing officers as to what she told them during that first interview? I don't believe, Detective Woolridge says it's some pre-trial interview that she said that the door was kicked open. It wasn't. No, I'm still back at the Union Fire Hall trying to figure out the discrepancy between what she told the police and when she told them. I mean, there's no testimony from any witness who said, yes, we showed, right, photos or, you know, we showed her newspaper articles. And in fact, she testified she never read any Tucson press. So she didn't see the picture of the red room at the Union Fire Hall. That's the state of the record, is it not? The state of the record was that the police had said, in white testimony, or argued, I think, in closing, that there were no photographs that showed the red room. And the only way she would know about the red room was because Jones had told her. Well, there actually was a photograph. She said she never saw any. But if the police had shown her, I mean, does it make any sense that somebody is going to say, yes, I shot this fellow in a red chair, and his head was slumped back, when, in fact, the physical evidence shows that he was executed by putting a gun in the back of his head on the bar, the bullet goes through and goes into the bar. And there's blood all around. You know, I guess I could see the argument being stronger if the witness said, I had a conversation with Jones, and here's what he told me. But the evidence was that she overheard bits and pieces of a conversation that Jones was having with Coates when Jones was staying at her place. That's correct. So, I mean, the jury heard all that, and they had to decide whether or not the bits and pieces that she says she overheard were corroborated by the other evidence in the case. And the prosecutors and the detectives fabricated evidence by Woolridge saying that there was no testimony at Nordstrom's trial that the door had been kicked in to bolster her credibility, which is exactly what happens in NAPU. And is it your suggestion, Mr. Maynard, that not only as to the kicked-in door, but as to the position of Mr. Bell, the victim, but as to everything else that Irwin said, it was simply a police plant? And she never really overheard Jones at all? And she wasn't with Coates when Jones was there, and it was all a fabrication planted by the police? No. I'm not suggesting that she never was there when Coates and Jones were there. But I am suggesting that I believe that her testimony was a fabrication. Totally. From beginning to end. Evidence that just aren't consistent. All right. You want us to draw the conclusion that from these two instances, the kicked-in door and the position of Bell, that that is clear and convincing evidence under 2254d-2 that overcomes any factual finding of Judge Leonardo? And I want you to do that in conjunction with the other issues that I've raised that we haven't talked about, with the misconduct from the prosecutors, but in particular, Woolridge's testimony. I mean, there's no reason to have asked Woolridge, what went on eight months earlier at a trial, unless you're trying to increase a witness's credibility, and you know that's important. There's absolutely no reason to do that. I have two and a half minutes left. I want to reserve them. That's all right. May I please the Court? Counsel. My name is Lacy Gard. I represent the respondents in this appeal, and I'm from the Attorney General's Office in Arizona. We've discussed the merits at length tonight, or this morning, and I just don't want to lose sight of the fact that these claims were found to be procedurally defaulted by the District Court, and I understand that the cause analysis necessarily involves an analysis of the merits as well. And I think that the Court, the observations of the Court that AEDPA applies to these factual findings are correct, and I don't think that Mr. Jones will be able to overcome them. The term fabrication has been thrown around this morning. That's a term that should not be used lightly. It's a term that's very serious, and allegations of fabricated evidence are very serious. But in this particular case, the State court found no intentional collusion, found that the evidence was not necessarily false, was at most misleading or containing some omissions, and found, most importantly, with respect to the kicked-in door, that it was not material. And materiality is a necessary element to establish a due process violation based on prosecutorial misconduct. Well, it wasn't materialistic guilt, right, if you think about it that way. But it does – what about the argument that was made toward the end by Mr. Maynard that these two errors, let's call them, are so important and so blatant that they provide the predicate for finding that the rest of the story told by Ms. Irwin was facts that she heard from the police, not from overhearing Jones talking to Coates? Well, we're bound by the state finding that the State court didn't find that. And there's just no evidence of that. And with respect to – and the other point I wanted to make on that is that the State court seemed to minimize the importance of this. And this was the same judge who had presided over the trial, so that's a critical aspect, too. This is the same judge who had witnessed Lana Irwin testify, who had witnessed Detective Woolridge and Detective Godoy, and who had witnessed the prosecutor's conduct. And these two – these two points of testimony that are being challenged were two among – I believe he said approximately 12 consistencies between her statements and the rest of the physical evidence, including the number of people shot by Jones and Nordstrom, that Jones had shot four people, Nordstrom had shot two. The fact that – that Jones had supposedly said, or he did say, according to her, two – that he had two partners, and they were brothers, and one of the brothers waited in the truck at one of the scenes, that was David Nordstrom. That the brothers were stabbed not long after the incidents, and that happened to the Nordstroms. They were stabbed in an unrelated incident. That the victims were shot in the head, that one of the victims was shot near a door, as happened at the Moon Smoke Shop, and the list goes on and on. So – so I think that the – if this was some sort of conspiracy, as – as Your Honor observed, if this was some sort of conspiracy to fabricate evidence, you would assume that the evidence being fabricated would be much more compelling than the position of the body of a – of a particular victim. I actually wanted to address a few factual points on the issue with the position of the body. Is – there was evidence presented – Mr. – and I've always understood his name is pronounced Alicata, so I'm not sure about the critic. He's the person who discovered the crime. The person who discovered the crime. He did initially make comments about the body being slumped over, but he was also contacted during the course of the proceedings, and at that time, he clarified that the body was leaning back. Additionally, there are two, at least two, I think, reports from responding officers describing the position of that body as leaning back in the chair. And the PCR court found that – that the – that the descriptions of the body being slumped or slouched are not necessarily inconsistent with – with the – the idea  You've got me on the chair, but I'm still struggling with the kicked-in door. And in particular, I think Mr. Maynard makes a good point that what's the purpose of asking Detective Woolridge, who sat through the Scott Nordstrom trial, about this discrepancy on the kicked-in door? I don't understand what Mr. White was trying to do with it. Was he trying to rehabilitate Irwin by saying, well, she wasn't at the Scott Nordstrom trial? So she couldn't have heard that testimony? Is that where he was going? That may have been the intention. I'm not – I'm not actually sure where he was going by asking her that question. I mean, even Judge Leonardo was, as he put it, troubled by the inconsistency in the representations that the prosecutor made versus the testimony of his two case detectives, who, if anybody should know what the overall evidence is in the case, it's the lead homicide detective and his partner. That's correct. And I think we'd be speculating if we tried to think what was going through David White's mind. He's, you know, unfortunately deceased. But one thing I think is critical in the chronology here, from Scott Nordstrom's trial to Jones' trial, is Lana Irwin was not – her testimony had not come to the light at the time, or her statement had not come to light at the time of Scott Nordstrom's trial. So at Scott Nordstrom's trial, the focus was on that door that had been kicked in by police. But by the time she was discovered, the evidence changed a little bit – it didn't change a little bit. There was always the damage to the other door. But there was no reason to bring that out at Scott Nordstrom's trial, potentially. But wasn't the state's theory that it was Scott Nordstrom who was the robber who ran to the back and executed the victim? Correct. Yes. And the testimony that there had been shouting about coming out? Testimony that there had been shouting about coming out, yes. Yes. So maybe they just didn't make the connection that there was – that that damage to the door was caused by a kick. You know, it's all speculation. We don't know. But we're bound by what the state court found. The state court found here, which was that there was no bad faith and that the inconsistencies in the testimony were not prejudicial to Mr. Jones. And that's the ultimate question, is whether he received a fair trial, notwithstanding any potential error by the prosecutor. What was the justification of the trial court for saying that this was perhaps erroneous but not intentional? Remind me, please. I believe it was based on the statements that the prosecutor had – in the PCR response, the State attached some statements made during State Bar proceedings about this event. And the prosecutor vowed in those statements that he made a simple mistake between the two doors. He got confused about which door they were talking about and that it was not intentional. He was very contrite in those materials. And based on – based on that and based on the testimony, certain evidence in the record, I believe it was in the grand jury testimony about there being damage to that door and then the evidence of a kick mark or scuff mark, the trial court found based on the evidence. Let's not get confused on doors here. So is the State's position that there's evidence in the record to support marks on both doors? Well, the one door was indisputably kicked in by the police. The other door is the one that we're talking about. That's why I'm trying to get this clear, because we're going to fall into the same trap that the trial counsel did. Right. So there was kick mark testimony about the second door. I'll call it the bathroom door. No. Testimony at trial. No. All this came out in the PCR proceeding. There was testimony in the grand jury proceeding. Right. That there was a mark on the door. Damage to the door, I think it said. Okay. The bathroom door. You know, I candidly will have to – I don't know the answer, Your Honor. I will have to check that. I mean, that's how I read the grand jury testimony, that he was talking about a kick mark on the bathroom door. Talking about damage to the bathroom door, and I believe that is correct. So in light of that, and also in light of the fact that the one victim, the victim who was killed in the back area, was found right outside of that door, and he was found in a position, as I understand it, that his feet were pointing towards that bathroom door as he had just emerged from it, those facts all support the trial court's finding here that this was not an intentional act. Thank you, Your Honor. If the Court has no further questions. I have no questions. What about you? No questions. Thank you, Your Honor. Can I have another time? No. Never know unless you ask. That's right. Judge, there are a couple of other issues where the PCR court made inappropriate or unreasonable, unreasonable findings. One is dealing with the telephone. The PCR court, what happens is that there is an issue on the testing of the telephone for the ankle bracelet for David Nordstrom. Judge Leonardo at trial wasn't going to let it in because he didn't think that there was enough foundation. The prosecutor, David White, who, by the way, the State Bar did find probable cause, and unfortunately, David White died of, I believe, of cancer before that proceeding. Well, if you were representing him, you'd be arguing that we couldn't conclude that he engaged in misconduct if all they found was probable cause, right, if he died before a final adjudication? You're absolutely right. All right. But let me ask about the telephone testing. I mean, wasn't there testimony by the supervisor for, I don't know what her title was, but the lady who testified about that it didn't make any difference whether it was the same phone or not, that the system still worked, although it might be somewhat degraded? She did. However, David White was there when the testing was done. He was told at the time the testing was done that this is not the same phone, that a portable phone had been used initially back in 1986, that this was a landline phone, 1996, I'm sorry. And at the Scott Nordstrom trial, Terry Nordstrom, the stepmother, gets on the stand and testifies that it's not the same phone. What happens is that when White is now trying to get in his evidence of the trial, he avows to the Court that Terry Nordstrom is going to come on and testify and she's going to say that it's the same phone. He knows it's not. But the finding that is unreasonably made by Judge Leonardo is that, well, there was no reason to think that she might not change her mind. There's absolutely no evidence in the record that Terry Nordstrom was going to change her mind. Now, there may be an issue as to the materiality of this. That's why I'm giving you the quizzical look, because in the face of the finding that it doesn't make any difference, how is that material? The finding, though, that he made was that David White had not misled the Court. He did. He knew what she was going to say. He specifically lied again. Now, the issue there is how material is it? Well, it's not nearly as material as when he puts Woolrich back on the stand to testify that there was no testimony in the prior case. Additionally, to show the conduct of these prosecutors, Judge, look at what they were doing during the interview when Jones' counsel went to the police and said, do you have a hat from Jones? And two months earlier, they had collected Jones' hat and his boots, and they had tested them for blood, and they knew that there was no blood that connected them. Mr. Boehner, isn't your argument running afoul of the Supreme Court's decisions in Napui and other cases that say we don't look at the conduct of the prosecutor, we look at the effect on the fairness of the trial? And if, even if the prosecutor, whether through innocent misrecollection or intentional misrepresentation, misrepresented facts but it had no material impact on the case, isn't that what we have to look at in determining whether Mr. Jones got a fair trial? In part. But you need to look at it collectively. You look at me, and Judge Gould looked at me and said, why would people put their lives on the line? There is misconduct over and over and over again. Unfortunately, I can only show in the certain cases that it had a material impact. But it did have a material impact. But it doesn't mean that there wasn't misconduct by these prosecutors and these detectives. This was not a fundamentally fair trial. We should not allow somebody to get the death penalty based upon the conduct that occurred in this particular case, Judge. Thank you very much, Mr. Maynard. Thank you for your argument, and also thank you, Ms. Gard. And this matter will be marked submitted, and we will stand in adjournment until tomorrow morning at 9.30 a.m. Thank you very much. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.  Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.  Thank you. Thank you. Thank you.
judges: Gould, Tallman, Bea